**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF MASSACHUSETTS**

**EASTERN DIVISION**

| | |
|---|---|
| In re<br>TIMOTHY R. JOSLIN,<br>                                Debtor | Chapter 7<br>Case No. 11-10171-FJB |
| MARINA HARBOR II CORP.,<br>                                Plaintiff<br>v.<br>TIMOTHY R. JOSLIN,<br>                                Defendant | Adversary Proceeding<br>No. 11-1289 |

**MEMORANDUM OF DECISION**

By its complaint in this adversary proceeding, plaintiff and creditor Marina Harbor II Corporation ("Marina") objects to the discharge of the 7 debtor, Timothy R. Joslin ("Joslin"), under 11 U.S.C. § 727(a)(3) and (a)(5).  Under § 727(a)(3), Marina alleges that Joslin has failed to preserve recorded information from which his financial condition or business transactions might be ascertained.  Under § 727(a)(5), Marina alleges that Joslin has failed to explain satisfactorily the loss of his assets or deficiency of his remaining assets to meet his liabilities.  After a day-long trial, the Court now makes the following findings and rulings and, on the basis thereof, concludes that Marina has not established cause for denial of discharge.

**Findings of Fact**

In July of 2006, Joslin was the sole owner, officer, and director of a corporation known as Boat House Pub on Green Harbor, Inc. ("BHP"), the business of which was to operate a restaurant known as

Boat House Pub out of waterfront premises owned by Marina (the "Premises") in Marshfield, Massachusetts. The parties' relationship began on July 24, 2006, when BHP, with the assent of Marina, assumed another restaurant's 60-month lease of the Premises and, in consideration of Marina's assent to that assumption, Joslin gave Marina a personal guaranty of BHP's obligations under the lease. The lease obligated BHP, as assignee of the original lessee, to pay a monthly base rent of $5,500, plus certain utilities and twenty percent of the real estate taxes. The term of the lease was from March 15, 2004, to March 15, 2009.

In connection with the guarantee, Joslin, on April 4, 2006, gave Marina a financial statement showing the assets and liabilities of Joslin and his wife (the "2006 Financial Statement"). Marina characterizes this statement as showing Joslin's own financial condition, but in fact it shows the assets of both Joslin and his wife. Only three items on the statement are listed as belonging specifically to Joslin or to his wife: $89,000 in a 401K account in Joslin's name, $72,000 in a 401K account in his wife's name, and life insurance in Joslin's name. As to all other items on the statement, the statement does not specify an owner. Because the document identifies certain assets as belonging to one or the other of the spouses, the most natural reading of the document is that undesignated items belonged to both spouses. The 2006 Financial Statement showed assets having a total value of $2,985,000, including three parcels of real estate having aggregate value of $1,827,000, a "business account" valued at $350,000, life insurance valued at $250,000, and the two 401K accounts, household personalty valued at $205,000, and a "boat, motor, and trailer" valued collectively at $6,500. The statement also showed total liabilities of $949,451, all but $14,725 of which was mortgage debt on the real estate, and net worth of $2,038,549.

BHP began operating a restaurant on the Premises shortly after it assumed the lease. Joslin was the manager of the restaurant; when the restaurant was open, he was there. Marina stated that it regarded BHP as Joslin's alter ego, but it has not formally so contended in this proceeding, and the

2

evidence does not support that theory or give cause to disregard the distinction between Joslin and BHP. Still, it is clear that Joslin was the sole principal in BHP as both restaurant and corporation. He was in charge of maintaining the corporation's books and records.

BHP made the base rent payments on the lease through the end of 2007, then missed the January 2008 payment. By January of 2008, BHP had also failed to pay approximately $50,000 in tax, utility, and related lease charges that had come due. From and after January 2008, BHP never made another payment of base rent or of any other obligation on the lease. Marina commenced eviction proceedings in March 2008, obtained a judgment for eviction near the end of June, and executed that judgment on July 2, 2008, at which point BHP was approximately $100,000 in arrears on lease obligations.

Joslin concedes that he is personally liable to Marina on the guarantee for a significant unsecured claim stemming from BHP's failure to make lease payments. Marina quantifies the claim at $242,101.64; Joslin listed Marina's claim in his bankruptcy schedules in that amount but also indicated that the claim was disputed. The nature and extent of the dispute is not in evidence. Marina did not immediately pursue either BHP or Joslin for the balance due on the lease; its litigation efforts in March through June, 2008, were limited to eviction. At that time, Marina was in the control of a Mr. Daniel P. Vigneau, with whom Joslin had negotiated BHP's assumption of the lease. Vigneau passed away in October 2010, after the eviction and before the commencement of this bankruptcy case.

When Marina evicted the Corporation, it did so without the knowledge of Joslin, who arrived at the Premises later that day to continue doing business—over what he expected would be a busy holiday week—but was denied access by Marina, a constable having overseen the changing of locks on the Premises. Though he was aware that summary process proceedings were underway, he had not realized or known that eviction was imminent, and he was surprised to learn that the eviction had occurred. Not knowing that eviction was imminent, Joslin had not arranged to remove BHP's records or

3

other personalty from the Premises before the eviction.  At the time of eviction, no personal property was removed from the Premises.  Thereafter, Marina never again gave Joslin access to the premises.

    The evidence shows that BHP maintained financial records in several ways.  BHP kept records of its sales, cash transactions, meals taxes, and inventory on a point-of-service system, including especially the computer on which that system operated (the "POS Computer"); at least until the time of eviction, this computer was located on the Premises.  BHP kept records of its accounts receivable, accounts payable, and checking activity on a separate desktop personal computer (the "PC"), also located on the Premises.  Paper records of the corporation, including vendor and invoice information, were kept in a filing cabinet on the Premises.  Other records were maintained by an independent bookkeeper whom BHP, through Joslin, retained to handle bookkeeping duties.  BHP's payroll records, including all payments of salary to Joslin himself, were maintained by a third-party payroll service that BHP used to handle its payroll throughout its twenty-three months of operation.  Through the payroll service, BHP generated and filed payroll tax reports that it filed with federal and state taxing authorities.  Joslin himself oversaw the payment of meals taxes and filing of related returns.  BHP never filed or generated a federal or state income tax return for 2006, 2007, or 2008.

    As Joslin credibly testified, the POS computer, desktop server, filing cabinet, and certain paper records of credit card sales that had not yet been processed, all were on the Premises at the time of eviction.  Shortly after the eviction, Joslin testified, he made an oral request to Vigneau for return of these records.  Marina questions the veracity of this testimony, noting that Vigneau is not available to corroborate it; but Kevin Joyal corroborated that Joslin made an early oral request.  Joyal, an employee of Marina, testified that when he and Vigneau inspected the Premises just four days after the eviction, Vigneau "took the checkbook and a couple of pictures *that had been requested* off of the desk and brought the back to his office."  It is clear, then, that Joslin made at least one oral request, in addition to a written request that he later made through an attorney—for, among others, the checkbook and

pictures. Despite this request, neither Vigneau nor Marina ever returned the POS Computer, PC, or paper records to Joslin. Joyal testified that the POS Computer remains on the Premises and that the PC was removed from the premises and kept in a locked office until it was delivered to Marina's attorney. Its disposition after that point is not in evidence.[1]

On January 7, 2011, Joslin filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code, thereby commencing the present case; his wife is not also a debtor in the case. Upon Joslin's own motion, the case was converted to one under chapter 7 on February 22, 2011. In the bankruptcy case, Joslin filed schedules of assets and liabilities and a statement of financial affairs (SOFA). The schedules and SOFA account for the three parcels of real property that appeared on the 2006 Financial Statement. They value Joslin's interest in BPH at $0 and note that it is defunct. They show total mortgage debt of $681,000, $13,000 in credit card debt, a $40,000 unsecured obligation to Joslin's father, and the disputed debt to Marina Harbor. They also show that Joslin's only significant income was (at the time of filing) from unemployment compensation, and that his total monthly income, $2,135.66 was far less than his family's monthly expenses of $7,400 and less even than his monthly mortgage payment on *either* of the two homes he and his wife still owned. Marina contends that Joslin filed this bankruptcy case solely to discharge his debt to Marina, but that is incorrect. The debt to Marina is not the only matter necessitating this filing.

During the case, the chapter 7 trustee, through able counsel, conducted a Rule 2004 examination of Joslin. I have no evidence that, at that examination or at any other time in the case, the trustee sought an explanation for loss of an asset or that, if such a request was made, it was not answered satisfactorily. Also during the case—and specifically, in the present adversary proceeding— Marina deposed Joslin and cross-examined him at trial. I have no evidence that, in that deposition or at trial or at any other time, Marina asked him to explain the loss or disposition of any asset that he or BHP

---

[1] Marina'a counsel later made statements about disposition of the PC, but not under oath and not as evidence. They are not evidence.

5

owned except the "boat, motor and trailer" that had been listed together on the 2006 Financial Statement.

On that statement, these three were collectively valued at $6,500. The same assets were not listed on the schedule of personal property that Joslin filed in his bankruptcy case in 2011. When asked at trial and in the deposition to explain the discrepancy, Joslin testified that (i) in 2009 he had sold the motor, "the only really valuable part of the trio," (ii) the boat, an inflatable craft, was ripped in several places, unusable, and more expensive to repair than to replace, and (iii) the trailer's axel had rotted off. He had omitted the boat and trailer from his schedules because they were worthless. There is no evidence to contradict this explanation, which I find credible—as was his testimony generally. I further find that Joslin's omission of the boat and trailer from his schedules was not done with intent to deceive or to defraud. At no time during the trial or in any pretrial discovery or examination did Marina ask Joslin to explain the loss or disposition of any other asset or to explain the failure of BPH's business.

During the bankruptcy case, Marina served on Joslin certain requests for production of documents. Neither the document requests nor the responses have been placed in evidence. Joslin concedes that, in response to these requests, he adduced relatively few documents, but it is also clear that most of the documents requested were not in Joslin's possession or control; many were among the records that were on the Premises at the time of eviction and that were never returned to Joslin. Marina does not suggest that Joslin failed to produce requested documents that were in his possession or control. No discovery request has required Joslin to collect records of BHP from third parties, but Joslin nonetheless did go to one third party, Scituate Federal Savings Bank ("SFSB"), where he requested the records of BHP's accounts there for the years of BHP's operation. BHP maintained all its bank accounts at SFSB. He was given records of only one of three or four accounts, and these Joslin passed on to Marina. Neither party has submitted these records into evidence, and the Court therefore cannot determine how much they disclose of BFP's business transactions or financial condition. There is no

evidence that Marina has directly sought records of BHP's business activities from the third-parties that would have many of these: the payroll company (whose name Joslin could not remember but whose location he could), the bookkeeper, SFSB, credit card companies, and major vendors.

**Procedural History**

After Joslin converted his case to one under chapter 7, Marina filed the complaint that initiated the present adversary proceeding. As amended, It contains six counts. The matter was tried in a single day, with testimony from four witness for Marina and one witness, Joslin, for himself. At trial, Marina waived Counts I and II, both for a declaration that Joslin's debt to Marina is excepted from discharge. Also at trial, the Court granted a motion by Joslin under Fed. R. Civ. P. 52(c) for judgment on partial findings as to Count V, an objection to discharge under § 727(a)(4)(D) for knowingly and fraudulently withholding recorded information from an officer of the estate; the Court found that Marina had not established that Joslin had withheld from an officer of the estate any of the materials specified in § 727(a)(4)(D). And after trial, Marina requested no findings as to Count IV, an objection to discharge § 727(a)(4)(A) for making a false oath in connection with the bankruptcy case; Count IV is therefore deemed waived.[2] Marina and Joslin have submitted proposed findings and conclusions as to the two counts remaining in controversy: Counts III, under § 727(a)(3); and Count VI, under § 727(a)(5).

**Jurisdiction**

The matter before the court is a complaint under 11 U.S.C. § 727(a) to deny the debtor a discharge. The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by a standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and (b)(2)(I) (a proceeding to determine the dischargeability of a

---

[2] In any event, as to the sole oath that was the focus of that count, the Court has found that Joslin did not act with intent to defraud, a necessary element of an objection to discharge under § 727(a)(4)(A).

particular debt is a core proceeding). The bankruptcy court accordingly has authority to enter a final order.

**Discussion**

**Count III: § 727(a)(3)**

Section 727(a)(3) states that

> (a) The court shall grant the debtor a discharge, unless—
>
> > (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The initial burden is on the party objecting to discharge to prove two things: (i) that the debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information"; and (ii) that the recorded information was information "from which the debtor's financial condition or business transactions might be ascertained." *Lassman v. Keefe (In re Keefe)*, 380 B.R. 116, 120 (Bankr. D. Mass. 2007). The plaintiff need not establish specific intent of any kind. *Id*. If the party objecting to discharge proves these two requirements, the burden then shifts to the debtor to prove that "such act or failure to act was justified under all of the circumstances of the case." *Id*.; *Campana v. Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (B.A.P. 1st Cir. 2000) (debtor must come forward with justification).

An action under this subsection can have six possible bases: concealment, destruction, mutilation, falsification, failure to keep, or failure to preserve. Marina has indicated that it is relying only on the last, failure to preserve records. And the records in question are only those of BHP, not of Joslin—except insofar as Joslin's records may be deemed to include those of BHP (an issue neither party

8

has addressed).[3] Marina does not allege that BHP—or Joslin, its sole officer—did not keep records of its financial condition and business transactions. Nor does Marina allege either that Joslin destroyed or is concealing records of BHP. The sole allegation is that Joslin failed to preserve records it had previously kept and whose adequacy Marina does not dispute.

As proof of this, Marina has shown that it asked Joslin to produce records of BHP but, in response to these requests, Joslin has been unable to produce any such records. In his defense, Joslin argues and has shown that the records were preserved for as long as they were in his control, through the date of eviction, at which point he lost control of them to Marina, who has since denied him access to them.

On these facts, I do not find that Joslin failed to preserve records. He preserved them for as long as it was in his power to preserve them, and he asked for turnover of the records after the eviction but was not given them. If this counted as a failure to preserve, I would find that this failure was "justified under all of the circumstances of the case." Joslin did not know that Marina would not give him notice of the time of eviction. Even if he should have known this, he cannot be faulted for failure to anticipate that Marina would not cooperate with him in returning to him the assets and business records of BHP. In any event, it cannot now be fair to deny him a discharge, at Marina's request, on the basis of Marina's own retention of precisely that which it now faults Joslin for not having.

Marina suggests that the Court should nonetheless find a failure to preserve because Joslin did not himself retrieve records of the BHP's activities from third parties. This is not the standard. In relevant part, § 727(a)(3) considers only whether the debtor has preserved records he had. It does not

---

[3] Count III of the amended complaint is only a single paragraph that includes no specific allegations of fact and merely parrots the language of § 727(a)(3). The only relevant recitations of fact elsewhere in the complaint are in paragraphs 40 and 42, both of which concern only the business records of BHP.

ask whether he retrieved records in the hands of third parties—records that Fed R. Bankr. P. 2004 enables creditors themselves to obtain directly. Judgment will enter for Joslin on Count III.[4]

**Count VI: § 727(a)(5)**

Section 727(a)(5) states: "The court shall grant the debtor a discharge, unless . . . (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). The Bankruptcy Appellate Panel has summarized the burdens:

> The plaintiff has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors. . . . Once the creditor has introduced some evidence of the disappearance of substantial assets, the burden shifts to the Debtor to explain satisfactorily the losses or deficiencies.

*Ehle v. Brien (In re Brien)*, 208 B.R. 255 (B.A.P. 1st Cir. 1999). The plaintiff must identify with specificity the loss or deficiency the debtor has failed to explain. *M&I Heat Transfer Products v. Gorchev (In re Gorchev)*, 275 B.R. 154 (Bankr. D. Mass. 2002). As Joslin argues, the plaintiff must also show that the debtor has been called upon to explain the loss in question, in the adversary proceeding itself if not before. There is no generally applicable requirement, in the Bankruptcy Code or the Statement of Financial Affairs, that debtors explain their losses or insolvency. A debtor may be denied a discharge for failure to explain a particular loss satisfactorily, but only if the debtor was first called upon to make an explanation.

Count VI of the amended complaint does not specify the loss or deficiency in question; it merely recites in conclusory fashion the language of § 727(a)(5). Neither does the amended complaint elsewhere discuss a loss or deficiency of assets, much less allege that Joslin has been

---

[4] Having found no cause to deny Joslin a discharge under this subsection, I need not consider the further question of whether § 727(a)(3) would permit denial of discharge where the records in question belong to a separate entity from the debtor that is nonetheless wholly owned and controlled by the debtor and whose debt the debtor has guaranteed. Neither party has addressed that issue.

called upon to explain one. In the parties' Joint Pretrial Memorandum, Marina did nothing to sharpen the basis of this count, stating only: "The Debtor has failed to explain the rather substantial loss of assets and the diminution in the Debtor's net worth from July 2006 until the date of the filing of the Bankruptcy Petition." This did nothing to put Joslin on notice of the assets in question. And it implied that Joslin had *already* been asked to explain a loss or diminution.

At trial, Marina inquired of Joslin as to only the "boat, motor, and trailer," and in response to that inquiry, Joslin provided a satisfactory explanation. Marina inquired about no other losses or diminutions in value. It rested without calling the debtor to testify.[5] And it introduced no evidence that Joslin had been asked about any other loss at another time during the bankruptcy case.

Most assets were clearly not in question. The real estate that appeared on the 2006 Financial Statement was all accounted for in Joslin's schedules and statement of financial affairs; and Marina did not inquire about them at trial. And at the start of the trial, Marina announced that it knew that the $350,000 business account had been invested in BHP. As to BHP, Marina made no request for explanation of the business's condition, profits or losses, capitalization, assets, or liabilities.

I conclude that Marina has not carried its initial burden of identifying the assets in question by appropriate allegations in the complaint, or at any time, and by failing either (i) to show that Joslin had earlier been asked to explain a specified loss or deficiency and had failed satisfactorily to do so or (ii) to ask Joslin at trial to explain the loss of a particular asset. As to the one group of assets as to which inquiry was made, the boat, motor, and trailer, Joslin supplied a satisfactory explanation. For these reasons, Marina is entitled to no relief under § 727(A)(5).

---

[5] Marina did later cross-examine Joslin, but no examination occurred in Marina's case in chief.

**Conclusion**

For the reasons set forth above, Marina's objections to discharge are overruled. A separate judgment shall enter accordingly.

Date: September 30, 2013    _____
Frank J. Bailey
United States Bankruptcy Judge